Let's see, this is case number 4-16-0775, in re the Commitment of Tye Suter. Let's see, Attorney Kate Levine is here for the appellant. Attorney Daniel Lewin is here on behalf of the FLE. Ms. Levine, am I saying your name right? Yes. Alright, great. You may proceed. May it please the Court, Counsel, my name is Kate Levine. I'm from the Chicago-Kent College of Law and I represent Mr. Tye Suter in this case. There is no dispute between the parties that Mr. Suter has a significant offending history. Mr. Suter himself does not dispute this. And that's the reason why, when he went to the treatment and detention facility under the Sexually Violent Persons Commitment Act, he consented to treatment within mere days of getting there. And he also stipulated to being a sexually violent person. He's recognized the need for treatment and rehabilitation. And that's really the concern in this appeal today. Where is the best place that Mr. Suter can get this needed treatment and rehabilitation? Now the trial court issued a ruling in a memorandum order, which I've attached to appellant's brief in the appendix. And in that order, the trial court ordered that Mr. Suter should be in secure care at the treatment and detention facility. This ruling was an abuse of discretion. The only reasonable decision based on the record before us was conditional release. And this abuse of discretion is evident in two areas. One, findings that the trial court made in its order. And two, evidence that the trial court did not adequately consider. With respect to the second issue in our brief, the failure to recall evidence, I will stand on the brief unless any of your honors have questions on that issue. I'll turn now to the findings contained in the trial court's memorandum order. There are a number of findings made in this order, and the findings to which I will be referring are in the appellant's brief in the appendix on page 3. There, the court's own rationale for sending Mr. Suter back to the TDF should have led to a complete opposite conclusion. Instead, that he was appropriate for conditional release. So first, I'd like to lay out for you the findings that I'd like to discuss, and then explain the flaw in the rationale. First and foremost, the trial court made a finding that a combination of individual and group therapy would be best for Mr. Suter. The trial court went on to say that Mr. Suter was deriving maximum benefit from group therapy. The trial court also indicated that individual treatment is only available out in the community on conditional release. It is not available at the treatment and detention facility, which I may refer to as the TDF. The trial court also found that there was an overriding need for public safety that prevailed given the current state of Mr. Suter's progress in treatment. The court went on to say that Mr. Suter was performing very well in treatment, and finally that any disruption in his treatment could have a negative impact on his progress. So I'll turn to those first couple findings that I mentioned. The trial court indicates that the best and most effective treatment is outside in the community. It's this combination of individual and group treatment. We do not have a combination of individual and group treatment at the TDF. Therefore, the treatment at the TDF is less effective than the treatment that is outside in the community. And this is supported by the record. It's supported by testimony of Dr. Abbott and Dr. Fogel, both of whom Mr. Suter called as witnesses at his dispositional hearing. And it's supported by studies that they cited indicating that sexual recidivism decreases when an individual goes through a combination of individual and group therapy. The trial court also found that Mr. Suter was performing very well in treatment. And this again was supported by the record. It was supported not only by Mr. Suter's doctors, but also by the state doctor, Dr. Travis. Let me ask a question at this point. Was the trial court's assessment of his present progress and treatment based on current, quite current activity and engagement by your client? I believe all of the doctors testified to recent records. Recent. Right. And if we look at a period of time, that's new. Correct. I mean, that degree of progress and that degree of engagement by your client, would you agree to that? Mr. Suter has been engaged in treatment since... I mean his engagement. Do you mean... In being receptive and acknowledging and coming to a greater realization of what needs to be done. Your Honor, do you mean in the totality of Mr. Suter's involvement with the correctional... Any kind of treatment. Okay, I understand your question. Yeah. So there is evidence in the record that Mr. Suter's earlier treatment while he was in the Illinois Department of Corrections was not completely successful. Right. At the very beginning, there was testimony from Dr. Travis that treatment providers really didn't know what they were doing when they first started providing this type of treatment to sex offenders. As time went on, Mr. Suter was engaged in treatment both at the Graham Correctional Center and the Taylorville Correctional Center. And it was at the Taylorville Correctional Center before he went to the TDF. That was where he really started to make this progress in terms of understanding his offending cycle. And there was a change in him, which Dr. Abbott testified to, where the pedophilic disorder from which he was suffering essentially changed from a type where it was distressing to him. Excuse me, I think I spoke up. Initially, it was not distressing to him. The pedophilic disorder was consistent with his personality. But as he went through treatment and as he had what Dr. Abbott called a religious conversion, he began to see the pedophilic disorder as being harmful to his victims and to other children. And Dr. Abbott really began to see this progress being made when Mr. Suter was at Taylorville. And, of course, that has continued on in even greater fashion while Mr. Suter has been at the treatment and detention facility. So the trial court has made these findings that, in fact, the best treatment is in the community and Mr. Suter is doing really well at the treatment and detention facility. And let's say for the moment that I accept that interpretation and I think that that's reasonable. There was also testimony that there was a, and I may not be stating this, that there were five stages that were recognized as needing to be worked through and that he was doing well and he was at the second stage. Well, that suggests that more progress not only needs to be made, but there was hope that that progress could be made within this institutional setting. I thought that's what the testimony was. And if we look at history, then recent, whether you judge that as over the last several years, you judge it over the last year, or the more recent reports suggest that this is, I don't necessarily want to equate it to an addict, but that's great, but you still have to worry about relapses. That's great, but the further you get in the treatment process, whatever it is, because there can be, maybe there are disagreements about whether he's getting what he needs now, but the further you get in that, the less risk there is of a relapse, or the less risk there is that there's harm to the public. So the point you're making is reasonable, but the trial court is entitled to balance that with the potential for future progress in the present setting, coupled with the high risk to the public because of his track history. Just like we were reading the racing form for a horse. This is how this horse performs. And until there's a change, it's probably going to continue to perform that way. I don't know if I've stated that very artfully, or if you understand the point I'm trying to make. I believe I do understand your point, Your Honor, and I will try to respond to the several points that you made. You're correct that there are five stages at the treatment and detention facility. But there's no case law, no statute that says a respondent must get to phase four or phase five before they will be allowed to leave the treatment and detention facility and be released to conditional release in the community. And in fact, we had testimony from Dr. Abbott, who said that he believed that his progress in treatment at this point was such that he could be safely managed in the community, despite the fact that he hadn't made it to the later stages of treatment. Now, with respect to his risk, it is true that on the actuarial instruments that psychologists use to measure risk estimates, that Mr. Souter had a relatively high number, a number of seven. Both Dr. Abbott and Dr. Travis gave him a seven. But we have testimony from Dr. Abbott that that number and the risk estimates that are associated with that number are not representative of his risk at this point. For one thing, that number and the risk estimates associated with it do not take any treatment into account. So Mr. Souter could go all the way through the five stages at the TDF, and that number would stay exactly the same. Moreover, there would be no significant decrease until he turns 60 years old. So right now he's 53. That score won't change for another seven years, despite this continued treatment that he's engaging in at the TDF. And that's just because the age is factored? I mean, that's sort of a bright line? Correct. Yes. There's cutoffs, I believe, you know, 40 to 59.9, then 60 and above, so on and so forth. Why is this assessment tool even utilized, then, if it's basically inaccurate or doesn't give us a clear picture of what the recidivism rate would be? I submit that some psychologists believe that it's the best way that we have at this time to measure someone's risk, but there are obviously limitations to that instrument. It's only an instrument, and no one can know with complete certainty whether someone is going to re-offend when they exit a secure facility and go out into the community. But what we have here is a very unique situation, because we have someone like Mr. Suter, who has significant financial resources, unlike most people at the TDF, that could be utilized in order to structure a program for him that guarantees that he would be receiving very good treatment and a lot of it, that he would be supported by individuals in the community, and that he could be further subject to varying degrees or varying additional safeguards, I should say, that all of these things would serve to protect the community. So the issue here is that Mr. Suter could be, in the community, receiving individual and group treatment, as would any other conditional release seed, but because of these resources, he could receive additional individual treatment. So it would not be as if he was only receiving a few hours of treatment. He could have as much treatment as his providers felt that he needed. In which he was willing to accept and pay for. Yes, that was the testimony of Dr. Abbott. Could he change his mind? Certainly he could change his mind, Your Honor. But that's where we come to what happens when the trial court orders someone to conditional release. It's not as if, as soon as the trial court orders it, Mr. Suter is free to leave the building and go do as he pleases on conditional release. What happens is the Department of Human Services begins developing a program that includes all of the services that Mr. Suter would need. So, for instance, he would need counseling. He would need community support. He would need to know where he was going to live. Things of that nature. The Department of Human Services has 60 days to complete this report. And the respondent and the Department of Human Services can agree to even more time beyond that. So, let me get back to your question here. Then that report, or that plan rather, has to come back to the court. The court has to sign off on it. Mr. Suter also has to say that he agrees with all of the conditions and that he will abide by them. If he does not abide by them, that's reason for him potentially to be violated on his conditional release and to be returned to the treatment and detention facility. Now, this plan would contain numerous conditions. Dr. Travis, the state's doctor in his testimony, said that conditional release can be, in many ways, far more restrictive than being at the treatment and detention facility. He said there were a crazy amount of rules and multiple layers of supervision. That's what conditional release is designed for. It's designed to acclimate someone to the community while also keeping the community safe. So, we have here 28 conditions that are in the SVP statute itself. And then you also have the 111-page Liberty Health Care Conditional Release Client Manual, which contains 59 additional conditions. And then the court has the ability to order any additional conditions that it sees fit. So, for example, this additional individual treatment or participation in the Circles of Support and Accountability Program, which is also known as COSA. And that's how it's referred to in our brief. But one of the other issues here is that the trial court has made this finding that a disruption in treatment could have a negative impact on Mr. Souter at this juncture. But there's simply no testimony to support that conclusion. As I've mentioned, he would, with the permission of the court, go out into the community to receive more and better treatment in the form of individual treatment, group treatment, and also participation in the Circles of Support and Accountability. It's not as if he would have COSA by itself and not have any of the conditions or programs that regular conditional releasees have. He would have above and beyond. And the idea behind this act is that people need treatment to get better. Treatment is not a one-size-fit-all type of thing. It has to be individually tailored to the person who needs it. Even Dr. Travis testified to such at the dispositional hearing. And here we have an opportunity to get really good treatment for Mr. Souter. Moreover, the trial court indicated that there was this overwhelming need, or overriding need, rather, for public safety that would prohibit his release. And I believe, based on what we've just talked about, that really becomes moot because you have all of these conditions designed to protect the public and Mr. Souter. Are COSA circles available in Illinois? Or are they available? They are available in other states. Currently, there is no COSA program in Illinois. But that in and of itself is not an impediment to releasing Mr. Souter on conditional release. And here's why. When the trial court ordered Mr. Souter to conditional release, it could have also included in its order that Mr. Souter begin meeting with the individuals who are going to be the volunteers that would make up the circles of support and accountability. They could begin developing this relationship of support and accountability. They would begin learning about Mr. Souter. They would begin to know what his offense cycle was like and what kind of triggers he has, so that all of these risks could be minimized while he was out on conditional release. Who would be responsible for setting that up? It would be a combination of the Department of Human Services and experts who have been involved in this case, who are familiar with putting a circle together. Additionally, Mr. Souter would have input, and the court would have input, as to what could be expected of him and the circle members. As we refer to in our brief, there would have to be sort of this master operating agreement called the covenant, which would set out all the rules and the roles of all the parties who would be involved. Moreover, simply because a plan does not exist at this point, does not mean that Mr. Souter should not be released on conditional release. He could stay at the TDF until the plan was ready, or he could remain at the TDF while the plan was being developed. Again, it's not as if he's just running out in the community doing whatever he pleases. So I see that my time is almost up. So for these reasons that we've discussed today and all of those in our brief, I would ask that you please order Mr. Souter to conditional release or reverse and remand for a new dispositional hearing. Thank you. Thank you, counsel. You'll have more time on rebuttal if you want to. Thank you. Mr. Lewin. Thank you, Your Honor. May it please the Court. Counsel. Counsel. I'm Assistant Attorney General Daniel Lewin for the People. Before the Circuit Court made its dispositional decision, it carefully considered and weighed the evidence in the case and applied it to the appropriate statutory factors under Section 40B2. In light of Respondent's offense history, the Circuit Court's conclusion that Respondent is not yet ready for conditional release was not an abuse of discretion. We therefore ask that this Court affirm. Let me ask you a question. Did you find, in the way the Court analyzed it and decided the case, that the trial court itself would be open to conditional release in the future? I mean, did it seem as if the Court thought this fellow is making progress? I believe so, Your Honor. One indication we have of that is that the Court says the Circles of Support and Accountability or COSA program, quote, may eventually aid Respondent. It was also Dr. Travis' testimony that at some point, because of Respondent's progress, he may be eligible for conditional release. I think the Circuit Court's decision is that Respondent is not ready for conditional release at this point. And that decision was not an abuse of discretion. Do you agree with counsel that a COSA Circle of Support could be created in Illinois? Or is your familiarity with it that it's sort of a, perhaps you know Justice Pope, is it a pro or counsel? It is a program that has been created in various states by people other than the offenders themselves. The program does exist in other jurisdictions. I believe it's in Minnesota, and I know it's in Canada. And is it administered by a private mental health service? Is it created totally by volunteers? I believe the record shows that it will depend on the jurisdiction. Some jurisdictions will have it be part of their penal system. I believe in Canada it's a voluntary arrangement. Sex offenders are often released in Canada without any penal supervision. And so communities will set up Circles of Support and Accountability. But the undisputed testimony here is that it doesn't exist in Illinois yet. And based on the nature of the program, where there has to be screening of both the inner and the outer Circle, which is lay people and professionals respectively, it cannot exist for at least six months, which the circuit court took into account and incorporated into its reasonable conclusion that respondent isn't ready for conditional release. And I do want to focus for a moment on the abusive discretion standard, which we all acknowledge applies in this case and means that this court will only reverse if it finds that the circuit court's decision was unreasonable, arbitrary, fanciful, or that no reasonable person could reach the same conclusion as the circuit court did. So counsel characterized the question in this case as whether where is the best place for a respondent to receive treatment. And respectfully, I think the question is better stated as whether the circuit court's answer to that question was so wrong as to have been unreasonable or arbitrary. And we don't think that respondent can make out that proposition on appeal, especially in light of if you look at the cases cited by both parties. Neither party has cited a single case where a circuit court's dispositional decision was reversed as an abusive discretion. So that gives a sense of what a high bar that is. And so the circuit court did consider the COSA program, did consider all of respondent's arguments, but ultimately concluded that he wasn't ready for conditional release at this time. So the circuit court started, as was appropriate under the statutory factors of 40B2, with respondent's offense history taken into account. And I don't need to lay it out in full detail here. Respondent has acknowledged committing sex offenses against 25 different children for 40 unique offenses. Of particular note to the circuit court, as it points out at page 2 of the appendix, was that many of these offenses were committed while he was under community supervision. So there were already some sorts of either formal judicial restrictions on him or informal restrictions like when he had a voluntary arrangement with the Urbana state's attorney to not prosecute a case if he agreed to receive treatment. Each time he is released from custody or each time he has a case dismissed or deferred judgment, he is returned to re-offense. So all of the empirical data here speaks to respondent offending while he's under community supervision. Even if he has a parole agent, even if he moves to Colorado to be under his grandmother's supervision, each time he is re-offending. And in escalating ways, his offenses get worse and worse. So the circuit court appropriately considered that under section 40B2. The next factor is respondent's present and past mental health history. That was undisputed in this case. All the experts agreed that respondent suffers from pedophilic disorder. They also agreed that pedophilic disorder is a lifelong or chronic condition. So he is always going to have a sexual attraction to prepubescent minors. And it's a question of how he's able to deal with those sexual urges. Which meant that the meat of the analysis was really going to be this third factor about the availability of treatment in different places. And the circuit court ultimately came to a reasonable conclusion in light of the evidence that respondent was not ready for conditional release. And that the best way to balance his need for treatment and the strong interest in public safety was for him to get institutional care in a secure facility in the treatment and detention facility or TDF. Should the court have given greater weight to the respondent's ability himself to acquire services? Services far different and perhaps more extensive and then arguably better than are presently available inside an institution? No, the court should not have given more weight to it because the weight given to that was appropriate. Well, I didn't mean it quite that way. I meant how should the court have considered that? The way the court took that into account. So for instance, we all acknowledge that the COSA program doesn't exist in Illinois. So that would be something that respondent can have set up specifically for himself because of his financial resources. But that would be in the future. Your point was that would have to be future oriented because it takes time to do that. Correct. But for the ordinary sexually violent person, COSA is off the table altogether because they can't set it up for themselves. That kind of is the point. Right. Do you take into account the resources of the offender in creating that which might not be available to somebody else? It's sort of like socialized, or I don't mean that to be a pejorative term, socialized medicine. In England, you want more care, you pay for it. Or you can accept the care that government provides. But if you want a specialist or you want extraordinary efforts directed towards you, you can receive those services as long as you pay for them. That, I think, is an appropriate consideration into the factors here. And the circuit court did take that into account. So by discussing the COSA program and explaining why the court didn't think that respondent was ready to be sent on conditional release because it doesn't exist here yet, because it takes time to set up, by considering that program, which is unique to the respondent in this case and unique to the fact that he has resources to set it up,  And ultimately, the way the court weighed that, we think, was ultimately correct, but certainly was not so unreasonable as to have been abuse of discretion. The other things that the court considered, I think, responds to the fact that respondent has resources. The court noted three factors why it was crediting Dr. Travis's opinion. The first is that, as Your Honor noted, respondent is only in stage two of the five-stage treatment. Dr. Travis explained what the five stages are. The first stage is basically the entry to treatment examination, so just the assessment to get him in. That's all he's completed so far. The second stage is the disclosure phase where he acknowledges his past offenses, and so he's currently undergoing that process. The testimony is that he's been very open about it, but he hasn't yet completed that second stage. That's what he's working on right now at the TDF. The third, fourth, and fifth stage is where the meat of learning to apply that to yourself and get a relapse prevention plan happens. Stage three is the self-application stage. Stage four is the incorporation stage. And stage five is transition. So that's where respondent is going to be developing and really learning how to use the tools to prevent himself from relapsing on conditional release, and he hasn't gotten there yet. And so while counsel is correct that there's no hard and fast legal rule that you have to be in stage three to be conditionally released, there is testimony from Dr. Travis that it will make it extremely difficult for him to manage himself on conditional release, especially considering that the respondent is 53 years old and he spent about four or five years of his adult life outside of custody. So he's going to be bombarded with stimuli if he's sent on conditional release, and he doesn't have arousal management training. He doesn't have a relapse prevention plan. At present, his main way of trying to cope with developing sexual fantasies about children is to interact with other committees at the TDF. He's going to be placed on house arrest for the first 30 days of his conditional release, and he's not going to have that tool available to him. He needs to put more tools in his tool belt and learn how to use them before he's sent out on conditional release. The circuit court recognized this, and that recognition was reasonable. We think even in light of the circuit court's consideration of respondent's resources, it's still reasonable. Could a respondent begin the process of establishing a COSA for his benefit even while he is in the TDF? I believe he could undergo that process, yes, Your Honor. So some of what goes into establishing the COSA, or the testimony says, is developing the relationships with the inner circle, pre-screening of people who will go into the inner circle. Theoretically, that could begin while he's in the TDF, I believe is the testimony in this case. But ultimately, that long delay before COSA is going to be able to be established, and the fact that there's lots of testimony from Dr. Travis that the circuit court credited, that there's a significant risk of backsliding if he's sent out on conditional release before he develops the full complement of tools that he needs to deal with the bombardment of stimuli on the outside. It's ultimately not going to be beneficial to him to be sent out on conditional release before he's ready. I have another question about disclosure or transparency. I thought that I understood from the record that there were contradictions or inconsistencies over a period of time about the disclosures that he was willing to make in terms of the numbers of victims, the incidents, and so forth. And now we've gotten to a point where, yeah, 25, 40 incidents, or 40 separate incidents. Understanding that nobody can know, is that totally accurate? What part does that play? I guess I'm asking, how do we know that he's, what was the testimony about how forthcoming he is now? Not about just acknowledging it, but perhaps acknowledging the magnitude of it, in terms of the accuracy of the disclosures he's making. We have, as Your Honor notes, we can't be certain about the accuracy of his disclosures. It's the testimony of even Dr. Travis that he appears to be forthcoming. So he didn't gain the PNL plethysmograph test. So there's some indication that what he's disclosing now is closer to the truth than it has been in the past. So he's been relatively forthcoming. But something we know is that he hasn't completed the disclosure phase of the TDF's treatment program. And so he's not done with the disclosure process. Now, it may be that the number is accurate, it may be a little low, but we know that he's not done with the disclosure process. And so ultimately, the circuit court's conclusion that he's not ready for conditional release is not an abuse of discretion. And as we've noted, when you compare this case to the case law, we think ultimately that supports the circuit court's conclusion and it supports affirming in this case. Obviously, neither side has cited a case where the circuit court's dispositional decision was reversed as an abuse of discretion. And we think in the cases we've cited, Erb, Lieberman, and Ehrlich all indicate that even when there's disagreement among the experts, even as to the quality of treatment inside the TDF versus outside, as it applies individually to the respondent in the case, resolving that disagreement is committed to the circuit court's discretion, and weighing that testimony, deciding who is more credible, and ultimately determining what to do with that evidence is committed to the sound discretion of the circuit court. And it's not going to be reversed if the court is considering the appropriate factors and weighing the evidence. And that's what happened here. So, for instance, the circuit court, I think to its credit, acknowledged Dr. Fogle's testimony that a combined regimen of individual and group therapy is a better form of treatment. But that doesn't support reversing as an abuse of discretion. That means that the circuit court considered all of the defense evidence carefully and understood the weight of the task before it, but ultimately concluded that the overriding interest in public safety, obviously it goes without saying he's at a much greater risk of reoffense when he is out on conditional release than when he is in the treatment and detention facility surrounded by concrete and barbed wire, whatever he can set up for himself. And a lot of the restrictions on him under the Liberty Healthcare Manual and under the statutory restrictions of Section 40B-5 rely on him self-reporting. So, obviously, there are heavy self-reporting requirements. He has to give daily logs. But ultimately, they are self-reporting requirements, and the system relies on him truthfully saying that he's not having people over to his house or truthfully saying that he's not going out into the public. So, ultimately, he's at a much greater risk of reoffense when he's on conditional release than when he's in the TDF. And the circuit court's conclusion that in light of that greater risk and in light of the fact that there's a chance for backsliding because he can't have interaction, he can't have interaction with other adults while he's on house arrest, in light of the fact that he doesn't have all the tools for relapse prevention, we think the circuit court's conclusion was not an abuse of discretion. I believe I will join counsel on standing on the briefs as to the second issue about failure to recall, with one brief note that counsel has stated that they believe we've waived our response by not citing the case law. And I'll note that our section on the failure to recall doctrine cites both the Williams and the Mitchell cases and distinguishes them, so we don't believe we've waived that proposition. But beyond that, unless Your Honors have any questions, we're willing to stand on the briefs. Thank you, Mr. Lewin. Thank you, Your Honor. Ms. Levine, any rebuttal? Yes, Your Honor. We understand that when the standard of review is abuse of discretion, certain deference must be made to the trial court's ruling and findings. But I submit that an abuse of discretion standard is not simply a rubber stamp for this court to say that the trial court did not abuse their discretion. This is a very unique case, and we have developed a record that indicates such. The trial court found and accepted that the best treatment for Mr. Souter would be in the community. It was unreasonable to order him to treatment at the treatment and detention facility when the best treatment for him exists elsewhere out in the community. Now, counsel has indicated that neither party has cited to a case where an abusive, or excuse me, a trial court's ruling was reversed for an abuse of discretion. But an equally valid inference is that there's been a limited number of appeals on this topic as the SVP law is relatively new. We're at about 20 years now, but in terms of law, that's pretty new. So I can cite, however, to in-rate detention of Len Zicke, which came out of the Second District. In that case, the appellate court did affirm the trial court's discretion in ordering a respondent to conditional release, but we have in that case a respondent who is very similar to the respondent that we have in this case. We had a respondent there who was motivated and cooperative in treatment, someone who was voluntarily admitting past indiscretions and offenses and who had support in the community and was just really trying to get better. When you look at the other cases that have been cited, you have respondents who are the exact opposite of Mr. Souter and Mr. Len Zicke. So I'd submit to this court that it's not an abuse of discretion to order someone to conditional release even though they have not completed the treatment program at the treatment and detention facility. Ms. Levine, we could agree with that, right? So if this individual had been ordered into conditional release, we might find that was not an abuse of discretion. But the same could be said of the other way, isn't that true? Certainly, Your Honor. But the findings that the trial court made in this case simply do not match up with its ultimate conclusion. The evidence in this case supports conditional release. And I understand that there are cases where one size expert says one thing and another size expert says another. That in and of itself is not enough to show that there was an abuse of discretion on the base of the trial court. But here we have experts who are testifying that having the pedophilic disorder, having this allegedly lifelong condition, is not an impediment to going out on conditional release. And it's not just self-report by the respondent saying that he won't go out and offend again. We have Dr. Abbott testifying to different instruments that were used to test Mr. Souter, which indicated that, yes, he still has this interest, but his arousal is incredibly low. And we also have this change in the type or the way he views himself as someone who has pedophilic disorder, which we talked about earlier. This transition from someone who did not find the pedophilic disorder to be distressing to him to someone who found that these acts that he had committed were very harmful to the people that he had committed them against when he was younger. So we don't have the same Mr. Souter today as we did when he was in the Illinois Department of Corrections. We have a Mr. Souter who is very much willing to get his life back on track. And the best place for him to do that, the place that the record supports is the best place for him to do that, is out in the community on conditional release. And if your honors do not have any additional questions. I don't see any. Thank you, counsel. You both presented your arguments very well on behalf of your clients. We'll take this matter under advisement. Thank you.